### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LUCILLE OLIVIERI, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 09-1240 |
| COUNTY OF BUCKS, et al., | : | |
| Defendants. | : | |

**August 15,  2011**                                                                 **Anita B. Brody, J.**


#### MEMORANDUM

Plaintiff Lucille Olivieri ("Olivieri") brings this action for employment discrimination she suffered while working as a 9-1-1 dispatcher for Defendant County of Bucks ("the County"). She brings claims under 42 U.S.C. § 1983 and the Pennsylvania Human Rights Act ("PHRA") against the County and one of her former supervisors, Defendant David Neil, Jr. ("Neil"), for subjecting her to sexual discrimination.  Olivieri also brings claims under § 1983 and Title VII against the County and a different supervisor, Defendant Audrey Kenny ("Kenny"), for retaliating against Olivieri for her complaints to administrative agencies about harassment.  I exercise jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

Today I consider two motions for summary judgment: one by Olivieri on her retaliation claims and one by the County and Kenny for all claims.  For the reasons that follow, I will deny Olivieri's motion and grant the County and Kenny summary judgment on all claims.

**I. B**ACKGROUND[1]

**A. The County's Sexual Harassment Policies, Training, and Complaint Procedure**

The County prohibits sexual harassment amongst its employees in its Non-Discrimination and Harassment Policy ("the Policy"). The Policy defines sexual harassment broadly:

> Sexual harassment may include a range of subtle and not so subtle behaviors . . . . [T]hese behaviors may include, but are not limited to: unwanted sexual advances or requests for sexual favors; sexual jokes and innuendo; verbal abuse of a sexual nature; commentary about an individual's body, sexual prowess or sexual deficiencies; leering, whistling or touching; insulting or obscene comments or gestures; display in the workplace of sexually suggestive objects or pictures; and other physical, verbal or visual conduct of a sexual nature.

Dolan Decl. Ex. 2, at 1. The County "encourages reporting of all perceived incidents of discrimination or harassment," declares that reports will be investigated, and conspicuously prohibits retaliation against any individual who reports harassment or participates in an investigation. *Id.* The Policy emphasizes that the "County encourages the prompt reporting of complaints or concerns so that rapid and constructive action can be taken before relationships become irreparably strained." *Id.* at 2.

---

[1] At summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Here the parties are both moving and nonmoving. Because I ultimately conclude that Olivieri's claims should be dismissed, I examine the record in the light most favorable to her.

This does not mean, however, that I accept Olivieri's counsel's narrative of events as true. At times, Olivieri's memoranda overstate the evidence or suggest a version of events that lacks evidentiary support. *See, e.g.*, *infra* note 3. Because of this, I do not rely on counsel's characterizations of the facts. I have exhaustively reviewed the evidentiary submissions. Except where the parties' briefs are specifically cited for an undisputed fact, facts that will be presented are those with support in the record.

Finally, the facts presented are also limited to those that could arguably be material to the legal arguments that I later discuss.

Recognizing that an individual may not wish to confront an offender directly, the Policy describes both an informal procedure and formal procedure for employees to address concerns. Pursuant to the informal procedure, an employee may notify his or her supervisor, Human Resources Director Carmen Thome, or Assistant Human Resources Director Meredith Dolan, who can talk to the alleged offender on the individual's behalf if the individual so requests. The Policy recognizes that there may be instances in which an employee wishes to only discuss the matter with a designated representative without formally reporting a coworker.

To make a formal complaint, employees are instructed to notify one of the same designated representatives, who will then initiate an investigation and corrective action. In practice, employees may approach any of their supervisors. The County's Emergency Communications Department ("the Department") chain-of-command from lowest to highest is: Dispatcher I, Dispatcher III, Squad Coordinator, Assistant Superintendent of Operations, Superintendent of Operations, Deputy Director, and Director.

The County conducts yearly training on the Policy with all employees and provides copies and revisions of the Policy to all employees. Olivieri confirmed receiving copies of the Policy and related training on April 1, 1999, April 10, 2001, October 21, 2004, and June 8, 2007. Neil confirmed the same on March 10, 1999, April 9, 2001, October 7, 2004, October 21, 2004, and June 6, 2007. The County provides additional training for supervisors, such as Neil, on all human resources policies and requires that they pass a written test. For example, in January 2008, Neil completed a management continuing education program specifically on the topic of sexual harassment.

**B.  Olivieri's Description of Her Experience in the Radio Room**

Olivieri began working for the County in 1991 and transferred to the Department in 1994. The Department provides emergency communication services for many agencies, including those that provide fire, police, and ambulatory services.  From 1994 until her 2010 termination, Olivieri was a Dispatcher I in the Department's radio room.  As Dispatcher I, Olivieri answered 9-1-1 calls from the general public and transferred calls to the appropriate emergency service responders.

In 1994, while still in training for her new position, Olivieri met Neil.  At that time, Neil was the day work supervisor in the radio room.[2]  Olivieri recalls that when her trainer was away, Neil would approach and ask, "'Hey, kid, you think you're going to go on the radio today or what?'"  Olivieri Dep. 15, Apr. 19, 2010.  From the beginning, Olivieri found his demeanor to be "aggressive" and his voice to be "very gruff."  *Id.* at 16-17, 22.  From 1994 to 2006, Olivieri continued to work with Neil, all the while believing that he did not like her.  One time, when Olivieri pointed out that Neil had mistakenly given a less senior employee overtime, he later passed by her and muttered "'fucking cunt, that fucking bitch, now she gets nothing.  Fuck her, she'll get hers."  *Id.* at 28-29.  Another time, Olivieri had a conflict with a coworker and Neil intervened to take the side of the other coworker.  She felt that he repeatedly did this, regardless of the gender of the other coworker.  Neil occasionally made comments to Olivieri about her

---

[2] At some point Neil became the Assistant Superintendent of Operations.  His exact position at different times is immaterial; at all times he was in a supervisory relationship with Olivieri.

4

body being attractive, which she ignored.  Neil's apparent dislike of Olivieri did not lead to discipline or other vindictive behavior.  *Id.* at 31:18-20, 130-31.

Neil's volatile behavior was not limited to Olivieri.  Olivieri would often witness his interactions with coworkers in the radio room.  Olivieri reports that he would "frequently berate" coworkers or threaten to hurt them to "send a message . . . that you don't want to be on his bad side."  *Id.* at 47.  Olivieri says of one instance: "I remember one time he had an issue, a scheduling issue with a woman named Karen Grabowsky and he said he wanted to punch her in the fucking mouth.  If she was a man, he would have punched her right in the fucking mouth." *Id.*  Another day, a different coworker cried because she heard Neil refer to her as "a fat pig."  *Id.* at 51, 75; Koszarek Dep. 35-36, Apr. 21, 2010.  Olivieri also observed Neil looking down female employees' blouses to see their breasts.

Olivieri also saw Neil touch coworkers inappropriately.  Frequently, Neil rubbed a female dispatcher's shoulders and sometimes also rubbed his groin area against her back.  As he walked away, he would say disparaging remarks about her such as, "'That fat fucking cunt.  I can't believe somebody would eat that,'" or "her pubic hair must be down to her knees."  Olivieri Dep. 49-50.  Olivieri did not tell Neil that she was offended by the comments or touching.  *Id.* at 53. Olivieri testifies that Neil rubbed his groin against her several times and that she saw him do this to other women as well.

Neil's vulgarity was not just directed at women.  In the radio room, he would loudly spew obscene remarks about male colleagues as well.  Neil referred to his supervisor, Superintendent of Operations Dennis Forsyth, as "fat pig" or "fat mother fucker" "[j]ust about every day,"

though Olivieri suspects that Forsyth did not hear these remarks.  *Id.* at 71.  Neil commented that

one of his subordinates "was a dirty filthy pig, he didn't wash his hair, had a boil on his neck."

*Id.* at 72.  Or about another coworker, Neil would say he "smelled like shit," or mock his height

with jokes such as "[h]e's short enough to blow Forsyth."  *Id.* at 72, 75.  Neil generally enjoyed

insulting how people were dressed, their cleanliness, their height, and their weight.

Most of Neil's boorish commentary was made about coworkers "behind their back" to

entertain others.  *Id.* at 73.  Olivieri admits that, many times, she laughed because "it was actually

funny, albeit inappropriate."  *Id.* at 73-74.  She says that Neil's behavior created "a terrible

subculture" in the radio room of insults, one which everyone fed into.  *Id.*  Olivieri describes the

atmosphere of the radio room to be one in which people, including herself, regularly used

profane words such as "fuck" and "cunt."  *Id.* at 44.  At times she laughed and participated

because she thought it was funny, but there were times when she was offended.  *Id.* at 74.

On April 12, 2004, Olivieri had a panic attack at work and left early.  When Olivieri

returned to work a couple days later, Anne Markowitz of Human Resources met with her.

Markowitz was concerned about Olivieri and they discussed the stresses of being an emergency

call dispatcher.  Olivieri testifies that she mentioned that Neil was the source of her stress.  *Id.* at

134.  The meeting then ended, without Olivieri telling Markowitz that Neil had been sexually

harassing employees.  *Id.* at 134-35.

On August 4, 2005, a fellow Dispatcher I filed a complaint about Olivieri.  The complaint

asked management to address Olivieri's "continuous negativity and complaining, ongoing crude

comments and rude behavior."  Mot. of Defs. County of Bucks & Audrey Kenny for Summ. J.

Ex. I, ECF No. 58 [hereinafter Defs.' Mot. Summ. J.].  Squad Coordinator Kathy Koszarek received the complaint and promptly conducted interviews with Olivieri and her coworkers. Koszarek asked, "Is anyone on the shift causing an intimidating or hostile work environment for you," "[i]s anyone on the shift interfering with your job performance," and "[h]ave you witnessed any harassment in the room, verbal or physical, that shows hostility or aversion towards any individual or group?"  *Id.* at 2.  Three of nineteen coworkers reported work-related problems with Olivieri; Olivieri was not disciplined.  No one voiced problems about Neil in response to Koszarek's open-ended questions about the work environment.  *See id.* at 3.

Olivieri testifies that Neil's hostility became increasingly sexual towards her in 2006 because she then had "something he wanted"—prescription pain medication.  Olivieri Dep. 77, 124.  When Neil initially approached her to ask whether she would give him pills for his hernia, she obliged.  He then "flipped from being nasty and insulting . . . to making a lot of sexual advances and propositions and . . . began to badger [her] for the pills every time he saw" her.  *Id.* at 78.  For example, in 2006, he said to her, "'Lucy, Babe, those tits look great.  Is anybody using them and is he a white guy?'"  *Id.* at 79.  Other times, he graphically speculated about her pubic hair, offered to give her oral sex, suggested that she do that for him, asked to see her nipples, said that he wanted to "titty fuck" her, and bragged about his Viagra use.  *Id.* at 79-82, 186.  Olivieri characterizes the abuse as occurring "[e]very day once he started taking and asking for pills."  *Id.* at 84.  Some comments were made to the whole room, others were whispered.  Olivieri describes feeling embarrassed by Neil's behavior, which she tried to ignore.  Olivieri did not report Neil's comments to human resources or to a supervisor.  *Id.* at 92:1-14; 133-135.

7

On March 3, 2007, Olivieri requested to change from day to night shifts.  She did not provide a written explanation for the request, but she mentioned to Koszarek that she wanted to avoid Neil.  Defs.' Mot. Summ. J. Ex. C; Olivieri Dep. 56-57; Koszarek Dep. 36.  She apparently did not tell her Squad Coordinator why she disliked Neil.  Olivieri's request was quickly granted.

After the switch, Olivieri "had little to no contact" with Neil.  Olivieri Dep. 86:18-19; *see id.* at 310.  At her deposition, Olivieri often uses her 2007 move to a different shift as a cut-off point to remember when an incident was likely to have occurred.  *E.g.*, *id.* at 197 (testifying that Neil did not rub against her after she moved to the second shift); 186:10-11 (responding that Neil did not look down her blouse "after I went to second shift.  He had little opportunity.").  After her shift change, Olivieri only saw Neil briefly every other week to pick up her paycheck or if she worked overtime.  *Id*. at 86-87.  When Neil did see her, he would ask her for pills.  *Id.* at 88.

In April 2007, there was an off-site, multi-day continuing education class that Olivieri and many other dispatchers attended.  At the meeting, Department Training Coordinator Fred Blunt led a discussion about the workplace environment.  Olivieri testifies that, during the class, she shared that Neil was "tormenting the women" that "she was tired of the behavior in the boys club."  *Id.* at 236-37.  Blunt recalls that other women complained about Neil's generally angry and intimidating behavior, which included sexual innuendo and profanity, but their complaints did not include sexual harassment.  Blunt Dep. 15-16, 35, 45, Apr. 16, 2010.  Blunt reassured the women that he would only raise the topic to Neil in such a way as to protect the women's identities.  Soon after the class, Blunt expressed concern about the crude culture of the radio room to a group meeting of Department employees that included Neil, Neil's supervisor Forsyth,

8

and squad coordinators.  Neil responded by acknowledging that he needed to tone down his behavior.

## C. The County Investigates and Confronts Neil

On or around April 18, 2008, Dispatcher III Christopher Mitchell reported Neil for insinuating that Mitchell would not be allowed to leave early unless he gave Neil prescription painkillers.  Mitchell's complaint to his supervisor was passed to her supervisor and led to an investigation by Human Resources.  As the investigation of Neil unfolded, Human Resources personnel also began meeting with women about whether Neil had been sexually harassing employees.  Olivieri declined to meet with Human Resources.  Thome Dep. 60:12-18, Apr. 21, 2010.  After confirming Neil's inappropriate behavior with other women, Human Resources told Neil that he resign or he would be fired.  On May 2, 2008, Neil retired.

In August 2008, Olivieri filed a complaint with the Pennsylvania Human Rights Commission ("PHRC") against the County and Neil for sexual discrimination.  Pl.'s Mem. Supp. Mot. Summ. J. 3, ECF No. 57-1; Defs.' Mot. Summ. J. 21.  In September 2008, Kenny joined the County as the Department's new Deputy Director.  On March 20, 2009, Olivieri initiated this action against the County and Neil.

## D. Olivieri is Disciplined and Terminated[3]

[3] Despite Plaintiff's claim that "there was one isolated disciplinary event before Ms. Olivieri filed this lawsuit, but there were multiple arbitrary disciplinary actions after she filed this lawsuit," Pl.'s Mem. Supp. Mot. Summ. J. 19, the record shows that Olivieri had been formally disciplined at least ten times before filing this lawsuit, Defs.' Mot. Summ. J. M.  I only detail those disciplinary incidents on which Defendants directly relied in discipline steps that culminated in

The County's discipline system aims to punish violations of County policy in stages of increasing severity.  Generally, before formal discipline begins, an employee receives informal counseling or a verbal warning for an infraction.  Further violations lead to a Step I warning, Step II reprimand, Step III suspension, and Step IV termination.  However, discipline need not proceed gradually and the discipline policy states that "immediate application of actions such as suspension, demotion and dismissal may be necessary."  Dolan Decl. Ex. 10.

On January 20, 2010, while at work, Olivieri's cell phone rang and she answered the call. As this was prohibited, Squad Coordinator David Hagerty scolded her and made a note of the incident.  On February 12, 2010, Olivieri and other Department employees received a memorandum reminding them of the no-cell-phone policy and warning them that violations of the policy would result in immediate disciplinary action.  Defs.' Mot. Summ. J. Ex. S.  On March 27, 2010, Dispatcher III Rob Kay saw Olivieri using her cell phone and he verbally reprimanded her.  Kay showed her a copy of the policy prohibiting cell phones in the radio room, advised her that it was her "only warning" to remove the phone, and made a note of the incident.  *Id.* at 3.  On May 18, 2010, Olivieri was again seen using her phone and, on June 6, Olivieri was issued a Step I disciplinary notice.  The notice referenced the two previous occasions on which Olivieri had been verbally warned about the same behavior, pointed her to the policy provision prohibiting cell phones, and warned her that future violations "may result in the next level of discipline up to and including termination."  *Id.* at 1.

---

Olivieri's termination.

At some point during Olivieri's escalating discipline, Assistant Director of Human Resources Meredith Dolan asked Deputy Director Kenny to take over as the sole disciplinarian for Olivieri because when lower-level supervisors directly disciplined Olivieri she complained of harassment.  Kenny Dep. 8, Nov. 23, 2010.  Typically, Kenny would not be involved in disciplinary matters unless and until an employee filed a grievance through the union, at which time she would review the grievance.  Kenny explains that she began administering discipline for Olivieri on behalf of lower-level supervisors to ensure that discipline "was consistently applied." *Id.* at 8.

Olivieri next received a Step II disciplinary notice based on three separate infractions. First, on June 11, 2010, Olivieri had a discussion with a supervisor, Dispatcher III Ed Boshell, in which Olivieri expressed anger with Boshell.  As he walked away, Boshell heard her call him "pussy."[4]  Boshell heard this insult and made a note of the insubordination.  Second, on June 12,

---

[4] Olivieri's brief states,"Ms. Olivieri did not use any such term."  Pl.'s Mem. Opp. Mot. Summ. J. 26.  Olivieri cites the deposition of a woman sitting near Olivieri who testifies that she heard Olivieri say to Boshell, "something like, 'Hi, Ed.  Thanks for throwing me under the bus.'" Frazer Dep. 11, Nov. 12, 2010.  The woman only heard parts of the conversation and she did not hear anybody use the word pussy.  *Id.* at 10-11.  Defendants present evidence that Olivieri had previously called three other supervisors "dick," "pussy," and "jerkoff" to coworkers in instant messages while at work.  Defs.' Mot. Summ. J. Ex. P; Olivieri Dep. 274-76.

Like other minor squabbles between the parties, this he-said, she-said dispute does not concern a material fact.  First, even the version that the witness describes could be considered insubordination and be disciplined as such.  Second, an employer can reprimand an employee that a supervisor says was insubordinate based only on the supervisor's statement when there is no evidence that the supervisor has a discriminatory motive.  Third, and most important, this incident is one in a laundry list of Olivieri's disciplinary infractions, any of which could alone be the basis for Olivieri's termination under the County's disciplinary policy.  Though Olivieri happens to dispute this particular comment to Boshell, she admits to engaging in the underlying behavior for many of the other incidents.  *E.g.*, Olivieri Dep. vol. 2, 369-73, Nov. 24, 2010 (admitting to calling the same supervisor a liar, intending for him to hear); *id.* at 380, 383

2010, Boshell observed Olivieri with her cell phone in the communications center.  Boshell noted

that she had already been warned about having her phone in the radio room and requested her

phone.  Olivieri refused and called him a "liar," intending for Boshell to hear her.  Boshell sent

Olivieri home for the rest of her shift for this insubordination.  Third, on June 14, 2010,

Olivieri's coworker Ginny Rosner sent a complaint about Olivieri to Forsyth and copied Kenny.

Rosner reported: "On June 12 while I was on the phone with a complainant I heard Lucy Olivieri

make the comment that if she had to listen to my voice anymore she'd put a bullet in the back of

my head. . . . I am afraid of what Ms. Olivieri may do or can do to my person after hearing that

comment."  Defs.' Mot. Summ. J. Ex. T, at 5.  Kenny followed up on the message first by calling

Rosner, who claimed that Olivieri also called her a "psycho," and then by meeting with Rosner

and the Squad Coordinator, Koszarek, at which time Rosner again expressed fear of Olivieri.

Kenny next interviewed a coworker who had witnessed the interaction.  Though reticent to get

involved, the witness admitted to hearing Olivieri make a comment about a bullet.  In

investigating Rosner's complaint, Kenny discovered a message that Olivieri had sent that day

through the Department's instant messaging service to a coworker that said, "punch her in the

head."  Defs.' Mot. Summ. J. Ex. T, at 10.  After receiving Rosner's written statement and

reviewing the instant message, Kenny disciplined Olivieri for making threats.  Olivieri was aware

that she could be disciplined for behaving unprofessionally towards coworkers in part because

she had been disciplined on this ground previously.  *E.g.*, *id.* at Ex. M., at 15 (reflecting that

Olivieri received a Step II disciplinary notice in 2006 for insulting a coworker).

---

(admitting to engaging in prohibited cell phone use); *id.* at 436-37 (admitting to insulting a
different supervisor's skills to the supervisor).

Olivieri's Step III discipline was for her job performance.  On June 13, 2010, Olivieri fielded a call for a domestic disturbance but incorrectly coded the call as a disorderly person incident.  Olivieri was aware that she could be severely disciplined for mishandling a call because Olivieri had been previously disciplined for this.  *E.g.*, *id.* at Ex. M, at 3 (showing that Olivieri received a Step III disciplinary notice in 1999 for incorrectly processing a call).

Olivieri's final discipline–which resulted in her termination–was imposed for additional instances of poor job performance and insubordination.  On June 19, 2010, Operations Supervisor Jay Thompson and Squad Coordinator Hagerty met with Olivieri to review a couple of calls that they had discovered Olivieri had mishandled.  For example, on one call, Olivieri failed to note that the caller said she was threatened, failed to note that a male interrupted to argue with the female caller, failed to ask if there were weapons, waited too long into the call to verify the address, verified the address improperly, took too long to enter the call, failed to ask the full name of the caller, inappropriately gave personal advice about the argument between the caller and the man who was threatening her, and incorrectly coded the call type.  As Hagerty went through these mistakes to teach her how to improve, Olivieri interrupted, stating, "I could care less what you have to say."  Defs.' Mot. Summ. J. Ex. V, at 4, 6.  After this discussion, Olivieri spoke to her union representative, who then asked Hagerty to meet with both of them to discuss why Hagerty was monitoring Olivieri's dispatch calls.  At this meeting, Hagerty explained it was his job to monitor calls.  Olivieri admits that she then disrespected her supervisor by insulting his skills.  Hagerty sent her home for the day for this insubordination.

13

Due to excused sick time and unpaid absences, Olivieri did not return to work after being

sent home until June 28, 2010.  When she came in, she was given the written notice of Step II

discipline for insubordination of Boshnell.  For the next month and a half, Olivieri again did not

report to work for a variety of reasons including vacation, conferences, and sick time.  On August

23, 2010, Olivieri was given a copy of her Step III disciplinary notice and a Termination notice.

On September 20, 2010, Olivieri amended the complaint in this action to name Kenny as a

defendant and to add retaliation claims.

## II. Legal Standard

Summary judgment is appropriate when the moving party has shown that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the

governing law," and the dispute is genuine if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986) (citation omitted).  "Where the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

In considering a motion for summary judgment, "the court is required to examine the

evidence of record in the light most favorable to the party opposing summary judgment, and

resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d

Cir. 2007).  The party opposing the motion, however, cannot "rely merely upon bare assertions,

conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676

F.2d 965, 969 (3d Cir. 1982).  He or she must present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. Discussion

Olivieri brings claims under a number of statutes.  In Count I, she sues the County and Neil under 42 U.S.C. § 1983 for violating her Due Process and Equal Protection rights by subjecting her to sexual harassment.  In Count II, she sues the County and Kenny under 42 U.S.C. § 1983 for violating her First Amendment rights when they ended her employment.  In Count III, she sues the County and Neil for a sexually hostile work environment in violation of the Pennsylvania Human Rights Act, 43 P.S. §§ 951–963.  In Count IV, she sues the County under Title VII, 42 U.S.C. § 2000e *et seq.*, for firing her in retaliation for her taking legal action regarding discrimination.  Olivieri moves for summary judgment on liability for Counts II and IV only.  The County and Kenny move for summary judgment on all claims.[5]

---

[5] Neil unexpectedly filed a motion for summary judgment more than four months after the deadline set by this Court, without requesting leave to do so or otherwise attempting to justify his blatant disregard for the scheduling order.  Def. Neil's Mot. Summ. J., ECF No. 75; *see* Order, ECF No. 53.  His motion will thus be denied.  Olivieri's § 1983 claim against Neil does not obviously fail without analysis.  *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20 (3d Cir. 1997) (reversing district court's dismissal of § 1983 claim against low-level supervisor who sexually harassed subordinate plaintiff, explaining that authority to hire or fire not necessary for supervisor to be acting under color of law).

**A.  Section 1983 Sexual Harassment Claim**

In Count I of her complaint, Olivieri brings suit against the County and Neil through § 1983 for violating her federal constitutional rights to be free from discrimination on the basis of sex.[6]  The County moves for summary judgment, arguing that Olivieri cannot establish municipal liability on this claim.  I agree and will grant the County's motion as to Count I.

**1.  Analytical Framework for Municipal Liability**

Section 1983 provides a vehicle for litigants to obtain relief from state and local officials who have violated federal law.  While the statute can also be used to obtain relief from local governments, it does not hold governments vicariously liable for all of their employees' miscreant activity.  *Bd. of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 403 (1997).  Rather, local governments are responsible only "for their *own* illegal acts."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).  Thus, a plaintiff bringing a § 1983 action against a government must show that an unlawful "action pursuant to official municipal policy" caused his or her injury.  *Monell v. Dep't of Social Servs*., 436 U.S. 658, 691 (1978).

---

[6] The complaint also mentions prescription medicines and a claim under the Fourth Amendment. Sec. Am. Compl.  ¶¶ 50, 52, 54.  Olivieri has withdrawn any claim based on these allegations. *See* Defs.' Mot. Summ. J. 53 n.21 (explaining that Olivieri did not oppose a previous dispositive motion regarding the prescription medicine claim and arguing that the claim is meritless); Pl.'s Mem. Opp. Mot. Summ. J. (not opposing summary judgment on this ground or otherwise explaining a Fourth Amendment claim); Defs.' Reply 11-12 n.7 (again asserting that Plaintiff had abandoned the claim); Pl.'s Surreply (not opposing summary judgment or otherwise explaining claim).

Cases since the watershed *Monell* decision have demonstrated the variety of actions that may be considered official municipal policies.  The type of proof necessary to show a policy varies by the facts of a case:

> A single incident violating a constitutional right done by a governmental agency's highest policymaker for the activity in question may suffice to establish an official policy.  A single incident by a lower level employee acting under color of law, however, does not suffice to establish either an official policy or a custom. However, if custom can be established by other means, a single application of the custom suffices to establish that it was done pursuant to official policy and thus to establish the agency's liability.

*Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989) (internal citations omitted).  While formal legislative enactments and official policy pronouncements by final policymakers can obviously be credited to the government, acts taken pursuant to an informal practice will only provide a basis for liability when such a custom is "so widespread as to have the force of law." *Bd. of Cnty.Comm'rs*, 520 U.S. at 404.  To successfully show that an informal custom is fairly attributed to the locality, a plaintiff can demonstrate that decision-making authority was delegated to those officials, a policymaker knowingly acquiesced to the custom, or the practice was so permanent and well-settled that a policymaker must have been aware of it.  *See Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990); *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 275-76 (3d Cir. 2000).

Once a plaintiff successfully identifies an official municipal policy, he or she must next "demonstrate that, through its deliberate conduct, the municipality was the 'moving force'" that caused the plaintiff's injury.  *Bd. of Cnty. Comm'rs*, 520 U.S. at 404.  If the "moving force" policy is facially lawful, the plaintiff must further show "that the municipal action was taken with

'deliberate indifference' as to its known or obvious consequences." *Id.* at 407.  This strict

standard ensures that liability only attaches to inaction that resulted from a deliberate choice.  *See*

*Connick v. Thompson*, 563 U.S. ___, 131 S. Ct. 1350, 1360 (2011).

### 2. Olivieri's Custom Claim

Olivieri claims that the County maintained a general custom of sexual harassment by

deliberately ignoring and failing to investigate widespread sexual harassment.  The County

responds that Olivieri has no proof to support such an accusation and that it promptly

investigated and took action upon receiving notice of sexual harassment.

A local government may be liable through § 1983 for sexual harassment amongst its

employees when the harassment is pursuant to a custom.  In *Bohen v. City of East Chicago*, the

Court of Appeals for the Seventh Circuit found a § 1983 sexual harassment claim actionable

against a municipal fire department where there was no sexual harassment policy, complaints

were addressed superficially if at all, and there was an ongoing practice in which "high-ranking,

supervisory, and management officials responsible for working conditions at the department

knew of, tolerated, and participated in the harassment."  799 F.2d 1180, 1189 (7th Cir. 1986).  In

contrast, in *Andrews v. City of Philadelphia*, the Court of Appeals for the Third Circuit found

that the city could not be held liable for sexual harassment of an employee by her supervisor

where a policymaker had not knowingly acquiesced in the harassment or delegated authority to

the harasser.  895 F.2d 1469, 1480-81 (3d Cir. 1990).

Unlike the municipal agency in *Bohen*, Olivieri's employer clearly prohibited sexual harassment in its Non-Discrimination and Harassment Policy.  The Policy was periodically communicated to employees through writing and in training.  In spite of his training and notice of the Policy, Neil sexually harassed Olivieri and her coworkers.  There is nothing in the record from which one could infer that Neil's behavior was symptomatic of how radio room managers treated dispatchers, or that upper management participated in or covered up Neil's harassment.  While at least one of Neil's supervisors was aware of his profane tendencies, there is no evidence in the record that anyone in upper management was aware that his vulgarity crossed the line into unwelcome sexual harassment.  When management personnel in Human Resources learned of Neil's sexual harassment in April 2008, Neil was abruptly forced to retire.

This is simply the kind of case in which municipal liability under § 1983 cannot lie.  Evidence that the County employed a single "bad apple" is not enough to ascribe the acts of the employee to the County.  By itself, Neil's behavior does not show a permanent and well-settled culture of sexual harassment so pervasive that a policymaker must have been aware of it.  Olivieri has not shown that Neil is a policymaker under state law, or that policy-making authority had been delegated to him.  There is also no evidence that any policymaker knew of the harassment and acquiesced to its continuation.  The only basis for linking Neil's actions to the County would be through respondeat superior liability, and the Supreme Court has clearly and repeatedly refused to allow § 1983 actions to proceed against local governments on that basis.

The evidence before me shows that a single employee regularly sexually harassed some of his colleagues and subordinates until more senior County officials learned of his behavior, at

which time he was fired.  There is no evidence of a general custom tolerated by the County on which a reasonable fact finder could premise liability.

### 3. Olivieri's Failure-to-Train Claim

Olivieri also argues that the County is liable for failing to train its employees to refrain from sexual harassment.  The County responds that it regularly trains its employees regarding sexual harassment and, in particular, it repeatedly trained Olivieri's alleged harasser.

In limited circumstances, municipalities may be liable for inadequately training their employees.  However, as the Supreme Court recently observed, a government's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359.  The failure to train on a matter must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

While Olivieri alleges that the County's training policies are inadequate, she does not explain how, and any illegality is not obvious.  Olivieri's failure-to-train claim will be dismissed as she has not supported her contention that the County was deliberately indifferent in creating or implementing its training program, or that its training program caused her injury.

### B.  Title VII Retaliation Claim

In Count IV of her complaint, Olivieri sues the County and Kenny under Title VII for disciplining and terminating her in retaliation for her taking legal action about sexual

harassment.[7]  The County and Kenny argue that these employment actions were unrelated to her administrative complaints or lawsuit.

Title VII prohibits employers from discriminating against employees because they have "opposed any practice made unlawful" by Title VII or because they have "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding or hearing."  42 U.S.C. § 2000e-3(a).  Under the first step of the applicable *McDonnell Douglas* framework, the employee must show a prima facie case.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  For a retaliation claim, the employee must show that she participated in activity protected by Title VII, she suffered a materially adverse action by the employer, and there is a causal connection between her protected activity and her employer's adverse action.  *Moore v. City of Phila*., 461 F.3d 331, 341 (3d Cir. 2006).  If the employee establishes a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse action.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  If the employer articulates such a reason, the burden returns to the employee to show that this reason is merely a pretext for intentional discrimination.  *Id.* at 804.  Notwithstanding this burden-shifting framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

---

[7]  Olivieri did not administratively exhaust this claim.  I nonetheless exercise jurisdiction over this Title VII claim because Defendants agreed to waive the exhaustion requirement so that the case could proceed more expeditiously.  *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (holding that the requirement of an administrative filing is not a jurisdictional bar and is a defense subject to waiver).

The parties do not dispute that Olivieri engaged in activity protected by Title VII by filing a complaint with the Pennsylvania Human Rights Commission in August 2008 and filing this federal lawsuit.  Rather, Defendants argue that Olivieri has not established the causation element of a prima facie case and that, even if she had, she cannot rebut the County's nondiscriminatory reasons for her discipline and termination.  I agree.  Even viewing all evidence in the light most favorable to Olivieri, she has not provided any evidence from which a reasonable finder of fact could infer a causal connection between her protected activity and her adverse employment actions.

Olivieri unsuccessfully tries to establish causation by belittling the seriousness of Defendants' reasons for disciplining her.  Though Olivieri may believe her repeated infractions are "trivial," Pl.'s Mem. Supp. Mot. Summ. J. 2, the County has shown that the behavior was uniformly prohibited by policies applicable to all employees, of which Olivieri had been given repeated notice, and for which Olivieri had been disciplined on many occasions before and after she engaged in protected activity.  There is nothing about the circumstances of her discipline from which a fact finder could reasonably infer that the discipline was discriminatory.

Olivieri also argues that it is suspicious that Kenny personally supervised Olivieri's discipline though Kenny typically would not get involved in discipline of dispatchers unless the employee filed a union grievance.  The only evidence in the record regarding the reasons for Kenny's involvement shows that Kenny's added involvement was a security measure taken to ensure that lower-level supervisors did not inappropriately discipline Olivieri.  Kenny Dep. 7-8.  Even if a fact finder were to disbelieve these proclaimed intentions, Kenny's additional

involvement meant that Olivieri received the same or less discipline than if the lower-level supervisors had been allowed to discipline Olivieri directly. While there may be a case in which a unique change of the discipline administrator is suspicious enough to support an inference of retaliatory motivation, that is certainly not the case here.

Olivieri has not pointed to anything in the record that suggests that any of her discipline leading up to her termination or the termination itself was influenced by a retaliatory motive. The absence of such evidence results in Olivieri both failing to establish an element of her prima facie case and failing to rebut the County's nondiscriminatory reasons for her termination.

## C.  Section 1983 Retaliation Claim

In Count II of her complaint, Olivieri brings suit against the County and Defendant Kenny through § 1983 for violating her federal constitutional rights to speak out on matters of public concern and to petition the government free from retaliation. The County moves for summary judgment, again arguing that Olivieri cannot establish that her protected activity was related to her termination.

### 1. **Analytical Framework for First Amendment Retaliation**

First Amendment retaliation cases are governed by the framework set out by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), rather than the familiar *McDonnell Douglas* burden-shifting framework that governs Title VII retaliation claims. *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 144 (3d Cir. 2000). From *Mt. Healthy*, the Court of Appeals for the Third Circuit has established a three-part test to evaluate a

public employee's claim of retaliation for engaging in protected First Amendment activity.  First, the employee must show she engaged in an activity that is protected.[8]  *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).  Second, the employee must show that the activity was a "substantial factor in the alleged retaliatory action."  *Id.* (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287).  Third, the employer may defeat the "claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct."  *Id.*

Olivieri's § 1983 retaliation claim must be dismissed for the same reasons that her Title VII retaliation claim fails.  Just as Olivieri did not show evidence of a casual relationship between her activity and termination for her Title VII claim, she has not presented evidence that her activity was a "substantial factor" in her termination.  And just as she did not present evidence to rebut the County's nondiscriminatory reasons for her Title VII claim, she has not identified a genuine factual dispute regarding whether the County and Kenny would not have terminated her in the absence of her protected conduct.

---

[8] To show protected activity a government employee must show "that he or she spoke as a citizen on a matter of public concern" and that the value of the speech outweighs the government's interest as an employer "'in promoting the efficiency of the public services it performs through its employees.'"  *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488 (2011) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  Whether sexual harassment complaints are matters of public concern has proven to be a particularly thorny question, the answer to which varies by the way in which the complaints were made and the scope of the harassment.  *See Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997) (finding requests for confidentiality in complaints and whether the harassment was systematic to be relevant but not controlling in assessing whether a report was a matter of public concern).  The interesting question of whether Olivieri's speech related to a matter of public concern is not before me because Defendants have not moved for summary judgment on this ground.  Moreover, Olivieri's § 1983 retaliation claim clearly does not survive the second and third steps of the *Mt. Healthy* inquiry.

**D.  Pennsylvania Human Rights Act Claim**

Olivieri also asserts a hostile work environment claim under PHRA against the County and Neil based on sexual harassment she endured.  The County moves for summary judgment by arguing that Olivieri's claim is time-barred by statute.[9]

The PHRA prohibits employers from discriminating against any individual "with respect to compensation, hire, tenure, terms, conditions, or privileges of employment" because of such individual's sex.  43 P.S. § 955(a).  The law is violated when sex-based intimidation and insults are so severe and pervasive that they alter the conditions of an employee's work environment. To establish such a hostile work environment claim, a plaintiff must show: "(1) the employee suffered intentional discrimination because of [his or her] sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability."  *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990).  To bring a PHRA claim, a plaintiff must file an administrative complaint with the PHRC within 180 days of the alleged act of discrimination.  43 P.S. §§ 959(a), 959(h), 962.  "If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA."  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997).

---

[9] The County also persuasively argues that Olivieri cannot show respondeat superior liability on this claim because the County is entitled to the affirmative defense described by the Supreme Court in *Burlington Industries v. Ellerth*, 524 U.S. 742 (1988), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  I need not address this issue because I find the PHRA claim to be time-barred.

Olivieri filed a complaint with the PHRC in August 2008.  Olivieri testifies about regular and pervasive incidents of inappropriate sexual behavior that she experienced and witnessed in 2006 and earlier.  There is no evidence in the record, however, that Olivieri was subjected to any sexual behavior in or after 2007.  Indeed, after she changed shifts in spring 2007 she states that she "had little to no contact" with Neil, the only alleged harasser.  Olivieri Dep. 86.  When asked to estimate the timing of sexual encounters with Neil, Olivieri seemed to use her 2007 move to a different shift as a cut-off to remember when sexual harassment was likely to have occurred.  *E.g.*, *id.* at 197 (testifying that Neil did not rub against her after she moved to the second shift); 186:10-11 (responding that Neil did not look down her blouse "after I went to second shift.  He had little opportunity.").

The only portions of the record that Olivieri cites to show that she continued to experience a hostile work environment after her 2007 shift change are vague statements.  After Defendants initially moved on summary judgment on the basis of timeliness, ECF No. 36, Olivieri signed a declaration generally proclaiming that Neil continued a sexual "approach" toward her after her shift change and "up to his resignation in 2008."  Pl.'s Resp. Mot. Summ. J. Ex. F.  The declaration is unhelpful because it does not specify any discrimination that occurred in the requisite time period.  During her second deposition, held after Defendants had briefed timeliness in a summary judgment motion made moot by a subsequently amended complaint, Olivieri asked counsel to clarify previous testimony and then generally said of Neil: "He stalked me and confronted me and groped me until the day he retired."  Olivieri Dep. vol. 2, at 446, Nov. 24, 2010.  Even if I ignore that this statement directly contradicts earlier testimony, Olivieri Dep.

26

197, Apr. 19, 2010 (testifying that Neil never groped her after she changed shifts), the content of both of Olivieri's vague statements are insufficient to create a genuine issue of material fact for trial.  Despite Defendants repeatedly putting Olivieri on notice throughout this lawsuit that they believed her claims to be untimely filed, Olivieri has not described a single incident of discrimination that occurred within 180 days of her filing with the PHRC.  Her claim under the PHRA will be dismissed as time-barred.

## IV. CONCLUSION

Olivieri's motion for summary judgment will be denied because she has not shown that the County and Kenny are liable for retaliation.  Defendants' summary judgment will be granted because Olivieri cannot show: municipal liability for her § 1983 sexual harassment claim, a nexus between her protected activity and her termination for her § 1983 and Title VII retaliation claims, and that her PHRA claim is timely.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: